# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-103


JON M. HARTMAN

VERSUS

GERALYN ADGIA BALLANCO HARTMAN


**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 11-C-1661-D
HONORABLE GREGORY J. DOUCET, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and John E. Conery, Judges.


**APPEAL DISMISSED;
SANCTIONS IMPOSED.**

**Mandi Borne Bucher**
**Diane Sorola**
**Attorney at Law**
**402 West Convent Street**
**Lafayette, LA 70501**
**(337) 234-2355**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Jon M. Hartman**

**Geralyn Adgia Ballanco Hartman**
**In Proper Person**
**174 Chatrian Street Box 73**
**Grand Couteau, LA 70541**
**(337) 692-9761**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Geralyn Adgia Ballanco Hartman**

**GREMILLION, Judge.**

Defendant-Appellant, Geralyn Adgia Ballanco Hartman, appeals, asserting that a transcript was the final judgment of the parties and that a written judgment that included a Joint Custody Implementation Plan (JCIP) should not have been rendered by the trial court.[1] For the following reasons, we dismiss the appeal and assess sanctions of $5,000 frivolous appeal and award the Plaintiff-Appellee, Jon Hartman, attorney fees of $2,500 for work performed on appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

A limited summary of the litigious background of this case: Jon filed for a La.Civ.Code art. 103(1) divorce in April 2011. He and Adgia were married on October 1, 2006, in Las Vegas, Nevada. Jon and Adgia never established a matrimonial domicile, and in February 2009, Jon moved to Joshua Tree, California for his job with the Department of Defense. Jon and Adgia have one daughter, Marguerite Adgia Hartman, born April 20, 2007.

The parties separated, and in October 2011, signed a consent judgment regarding custody and child support matters. A judgment of divorce was granted on November 28, 2011. In August 2014, a consent judgment was filed into the record allowing Adgia to relocate with the child to Europe. In September 2015, Jon filed a rule to show cause for contempt. In November 2015, Adgia filed rules for contempt and to increase child support. In March 2016, she filed a rule for contempt and rule to show cause. In May 2016, Adgia filed for a temporary restraining order. Shortly thereafter, in May 2016, Jon filed a motion to dissolve the temporary restraining order and exceptions of unauthorized use of summary proceedings and no cause of

---

[1] Ms. Hartman is referred to as "Adgia" throughout the record, and we will do so here. We refer to the parties by their first names for ease of reading since they share the same last name.

action. In a *Per Curiam* judgment, the trial court denied Adgia's request for a temporary restraining order.

In June 2016, the parties entered into a consent judgment addressing numerous custody and child support issues. In June 2019, Adgia filed a rule to increase child support, decrease visitation and rules to show cause. In July 2019, Jon filed a declinatory exception of no cause of action and rule to show cause for sanctions. In October 2019, Jon filed an answer and reconventional demand asserting material changes since the consent judgment of June 2016 and requesting that he be named the domiciliary parent.

In January 2020, Adgia filed a motion to compel, rule for contempt, and request for attorney's fees and court costs. Jon filed a motion to compel discovery and for a protective order in January 2020.

The trial court ordered a pre-trial conference to be held on February 7, 2020 and stated that any issues not resolved in the pre-trial conference would immediately be determined via hearing following the conference. On June 5, 2020, the trial court, in a written *Per Curiam* stated it had received a *Motion to Make Transcript Judgment of the Court with Incorporated Memorandum in Support* and a motion to withdraw by Adgia's then counsel, Cynthia A. DeLuca. Jon's counsel filed an opposition and informed the court that she intended to file a civil warrant on behalf of Jon because Adgia did not bring the child to the airport on June 1, 2020, for his scheduled visitation. Following a telephone conference, the trial court ordered Adgia to bring the child to the airport on June 2, 2020, to begin Jon's seven weeks of summer visitation pursuant to the February 7, 2020 stipulated judgment.

Adgia's motion to make transcript a judgment was filed on June 18, 2020, and stated that, "To date, the parties have been unable to agree to the verbiage for the Consent Judgment from February 7, 2020, which was read onto the record." On June

18, 2020, Jon filed a rule for contempt with request for expedited hearing following the failure of the custody exchange that was to begin his summer visitation.  In a *Per Curiam* statement dated June 18, 2020, the trial court set forth the following (underlining our emphasis):

> The court addressed Attorney Cynthia DeLuca's *Motion and Order to Withdraw as Counsel of Record* in a telephone status conference with all counsel of record on June 17, 2020.  The court informed counsel that it would grant Ms. DeLuca's *Motion and Order to Withdraw as Counsel of Record.*  The court requested that Ms. DeLuca notify Adgia of the granting of the motion.
>
> **The court strongly suggests that Adgia retain new counsel prior to the contempt hearing set for July 9, 20210.**
>
> Also before the court is Cynthia DeLuca's *Motion to Make Transcript Judgment of the Court with Incorporated Memorandum in Support.*  The court reviewed the transcript of the stipulation reached on February 7, 2020.  As stated, at the conclusion of the stipulation, the court swore in the parties.  Both parties testified that this stipulation was, in fact, their agreement reached in order to resolve all issues that would have come before the court that day.  The court explained to the parties that the stipulation would become the judgment of the court *effective immediately.*
>
> The court further explained that the attorneys would be responsible for preparing a judgment containing the stipulation.  The parties were unable to agree upon a judgment and the aforementioned events ensued.  However, the court reminds the parties that the stipulation reached on February 7, 2020 became the judgment of the court that day as stated on the record several times.  All things considered; the court will defer ruling on the *Motion to Make Transcript Judgment of the Court with Incorporated Memorandum in Support* at this time.

The parties had a hearing on the rule for contempt on July 9 and 10, 2020. Another hearing was ordered on July 15, 2020, to allow Adgia additional time to advance her claims.  Testimony from the hearings is set forth below.

On October 5, 2020, the trial court rendered two judgments:  a "CONSENT JUDGMENT" and a "CONSENT JUDGMENT AND JOINT CUSTODY IMPLEMENATION PLAN."  In the "CONSENT JUDGMENT," the trial court stated:

On July 10, 2020, the parties reached a stipulation in this matter. The court accepted the stipulation and ordered that it become the judgment of the court effective that day. However, due to the fact that Geralyn Adgia Ballanco Hartman was unrepresented, and further due to the fact that the parties were unable to reduce their prior stipulation of February 7, 2020, to a written judgment, the court prepared this judgment. Except as modified herein, the stipulation of February 7, 2020, which is memorialized in the *Consent Judgment and Joint Custody Implementation Plan* dated October 5, 2020, remains in full force and effect.

The "CONSENT JUDGMENT" made modifications to the February 7, 2020 judgment for make-up periods of visitation for Jon following the June 1 and 2, 2020, failed custody exchange. The "CONSENT JUDGMENT AND JOINT CUSTODY IMPLEMENATION PLAN" (JCIP) set forth the stipulations made at the February 7, 2020 hearing and outlined the custody and child support provisions agreed to by the parties.

On October 7, 2020, Jon filed a rule to modify child support. On October 13, 2020, Adgia filed a twenty-four-page motion for new trial relating to the October 5, 2020 JCIP. Adgia was then hired as a public defender in the 27th Judicial District Court requiring the judge who had presided over the case to file a judicial recusal on February 1, 2021.

Following hearings on July 12, 2021 and July 15, 2021, Adgia's motion for new trial was denied in September 2021, and an order was entered on September 27, 2021, with the trial court finding that no substantive changes had been made in the JCIP from the February 7, 2020 hearing, and "the substantive contents of the transcript were in fact transposed into both these documents."

Adgia timely appealed on October 28, 2021. In a five-page brief, Adgia assigns as error[2]:

---

[2] Of the five pages, the first page is a jurisdictional statement, the second page a table of authorities listing "LSA-R.S. 13:4231." The third page a "Statement of the Case and Procedural History," and the fourth page and a quarter of the fifth page addressing the "Assignments of Error" and "Argument on Issues Presented."

The Trial Court erred as a matter of law and abused its discretion by issuing a written judgment on 05 October, 2020 as to issues that were previously fully adjudicated and resolved and terminated in a final judgment entered into the record of the court six months earlier.

On September 23, 2022, Jon filed a brief asserting that Adgia's brief "does not raise any genuine issue, or make[] any reference to pertinent supporting facts, the record, statutory authority, or case law which would require a response." Jon simultaneously filed a motion for sanctions, attorney fees, and costs. Adgia filed an opposition to the motion for sanctions, attorney fees and costs. For the following reasons, we dismiss Adgia's appeal, sanction her $5,000 for frivolous appeal, and assess her with $2,500 in attorney fees for work performed on appeal on behalf of John.

## DISCUSSION

The entirety of Adgia's argument pertaining to her assignment of error is reprinted below:

> Judge Meche expressly stated on the record, on 07 February, 2020 that his judgment entered on 07, February, 2020 on the record, based on stipulation of the parties, was a final judgment, constituted law of the case and between the parties.

> There was no reason for the Judge to issue a separate different written judgment six months later with respect to the same claims, as the verbatim transcript record constituted a formal Judgment. The latter appears to have been improvidently issued.

> The 07 February, 2020 judgment, contained and entered into the record, as a stipulated consent judgment after the parties were placed under oath, is entitled to the benefit of res judicata and is law of the case. LSA – R.S. 13:4231, Acts 1990, No. 521, § 1, eff. Jan. 1, 1991.[3]

---

[3] Louisiana Revised Statutes 13:4231 states:

Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:

The subsequently issued 05 October, 2020 judgment as to the same issues that were litigated to stipulated judgment back in February is consequently null and void.

Although Adgia, a licensed attorney in the state of Louisiana who has been a member of the bar for over twenty-five years, asserts that the October 5, 2020 judgment is "different," she gives no detail as to how it differed or how the difference had any effect on her.

Because this portion of Adgia's argument contains no record references, specificity, law, or legal analysis, she is not entitled to relief on this argument because of her failure to comply with Uniform Rules—Courts of Appeal, Rule 2-12.4 (B)(3)-(4), which state:

> (3) The court may disregard the argument on an assignment of error or issue for review if suitable reference to the specific page numbers of the record is not made.
>
> (4) All assignments of error and issues for review must be briefed. The court may consider as abandoned any assignment of error or issue for review which has not been briefed.

It is well settled in this circuit that a party abandons assignments of error that are not briefed. *Charles v. Landry*, 09-1161 (La.App. 3 Cir. 3/10/10), 32 So.3d 1164.

Accordingly, Adgia's appeal is dismissed; however, we have reviewed the entire record in order to determine if sanctions for frivolous appeal are warranted.

### *February 7, 2020 Stipulation*

---

(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.

(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.

(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.

6

At the commencement of the proceedings, the trial court stated (emphasis added):

> I'm going to swear the parties in, make sure they understand and agree to the agreement and, at that point, I'm going to decide it to be the judgment of the court. Any my understanding of case law ---pretty sure across the State---but for sure Third Circuit is that that stipulation, once accepted by me and declared to be an order of the court, is an order of the court effective immediately. *The lawyers will go and draft the paperwork to complete this big old file, but if something falls apart between the time of the stipulation and the time I'm supposed to receive the written judgment*, if I've declared that stipulation or this agreement---after you've told me that this what you've agreed to---and I've declared it the judgment of the court, I can go back and I can say this is the judgment of the court. And that's why I want to get that today so that everybody leaves here today with a clear understanding of that the agreement is and that it becomes the judgment of the court today.

The parties thereafter hammered out the details of the stipulated agreement amounting to thirty-seven transcribed pages. This binding consent agreement included a notice period that required Jon to inform Adgia more than forty-five days before the scheduled visitation that he planned to exercise his right to do so. It also resolved motions that were set to be heard by the trial court on March 5 and 6th, 2020. The trial court noted that the parties negotiated from 11:00 a.m. to shortly after 5:00 p.m., when they went on the record. At the conclusion of the hearing, the written judgment was again discussed by the trial court (emphasis added):

> Well. Here's my thinking. Even though I'm optimistic I'm a worse [sic] case scenario kind of person. I had a thought earlier that I would certainly---even though this is the judgment of the court right now, *I had a thought that I surely would like the judgment signed, sealed, delivered---as the song says---by March 5th*. I thought that would've been a good—the day of the trial could've been a good deadline to say, hey look y'all, we're going to come to court anyway. Take that time that you would have been preparing for trial and get this thing done and let's hammer it out. I'm very accommodating, I think as you know, to telephone status conferences and stuff to try to hammer out those kinds of details so that attorneys don't have to come back to court.
>
> If you need a transcript, I'll give you more time, Ms. DeLuca, okay?

Ms. DeLUCA[4]:

> Do you want to get the transcript? I usually do when it's this kind of judgment so I don't want to miss anything.

GERALYN ADGIA HARTMAN:

A. I think so.

The trial court then offered its assistance if there were "any stumbling blocks and we'll iron it out on the phone."

## July 9-10, 2020 hearing on rule for contempt with request for expedited hearing/bench trial

*July 9, 2020- first day of the hearing*

This hearing began with Jon's rule for contempt, which was filed on June 18, 2020 following the June 1 and June 2, 2020 event in New Orleans in which he had flown to the city to accompany the child to his home state of Wisconsin, but she refused to go for her scheduled summer visitation. Jon missed his first flight and had to get new tickets for a later flight, but Adgia left the airport with the child. Despite numerous attempts via text, calling, Facetiming, and the court wizard system, Jon received no response and had to board the plane and return to Wisconsin for work. Jon had to contact his attorney and Adgia's attorney at the time, resulting in eight emails between the attorneys because Adgia would not respond to Jon.

Adgia then made a number of random claims about the unfair disadvantage she had at the hearing and "backdoor" dealings that resulted in her attorney "being let go without her knowledge" and the trial court stated, addressing her:

> Let's address a couple of things that you said. Here's the dilemma that I am in. First of all, we had a stipulation put on the record on February 7, 2020 and that should have been reduced to a written judgment. . . .---around May I got a motion from your attorney to make the transcript the judgment of the court because the parties allegedly

---

[4] Ms. DeLuca was Adgia's attorney at this hearing.

were not able to agree on the language in the judgment. That was received May 15th.

With that Ms. Deluca also filed a motion and order to withdraw as counsel of record. So, keep in mind, your attorney filed a motion to withdraw. I did not grant it at that time. On June 1st we had a lengthy telephone status conference in which you were present with your attorney, and with Ms. Bucher and with Mr. Hartman. . . .

After that, whatever transpired on June 2nd, I don't know. I was not there. And that is why we are here, and I have not made any judgment, I have not made any determination. But here's the problem I have, to address your concerns about fairness. Fairness requires me to be fair to both sides. And part of Mr. Hartman's allegations are that he has now missed about [about a month of summer visitation].

After lengthy and patient instruction by the trial court that the parties could work this out themselves, the trial court recessed, but Adgia and Jon were unable to come to an agreement. At one point, Adgia offered to "throw away" the February judgment and try Jon's rule for sole custody that same day. The trial court then stated (emphasis added):

Okay, let me make this clear if I haven't before. I take the position that when I asked the parties on the record under oath that they understood the agreement, when I asked parties under oath if it was, in fact, what they had agreed to do back in February to resolve the issues that would have come before the court, when I asked the attorneys under oath if they had consulted with --- I'm sorry, when I asked the parties under oath if they had consulted with their attorneys, back in February when I asked the parties under oath if they understood that once I accepted their agreement that it would become the judgment of the court, when I asked the parties back in February if they understood that once I accepted the agreement and it became the judgment of the court that there would be consequences for a failure to follow that judgment of the court, at that point the case law says to the best of my understanding that that was a judgment.

*I asked the attorneys to reduce the judgment to writing as is customary.* I also take the position that a joint custody implementation plan is required under the law. When Ms. DeLuca submitted her motion to have the transcript made the judgment of the court, that is something that, to be quite honest, I've never really seen before, but I understood what she was trying to do. In other words, say --- and she said as much in one of the phone conferences of the hearing --- that look, all they agree on is what they agreed on. We can't agree beyond what was put on the record in February and that's why they can't get the judgment in writing.

9

So let's make it clear. I take the position that the stipulation in February, which was placed on the record under oath after I asked all of those questions that I just referred to, and everybody agreed that that was the judgment. I take the position that was a judgment of the court as of that moment, as I said that day, effectively immediately.

Now, when the attorneys cannot agree on the written judgment, typically I will either have a conference and hash out that argument, or I can set it for hearing just not change the agreement but hash out the disagreement over the wording, I can do it myself. But I don't do that without giving the parties an opportunity to tell the problems that had with the written judgment. And that's why we don't have a written judgment yet, because when Ms. DeLuca filed that motion and the motion to withdraw I was in the process of setting up something to try and talk about it, then all this stuff came up. And to be honest, probably at the end of this hearing I was going to ask you if you knew your objection to the written judgment and ask Ms. Bucher, or her client's written objection and then decide whether I should just prepare the judgment or perhaps ask Ms. Bucher to prepare it and circulate it to you.

But the bottom line is this, the transcript and the substance of that agreement is the judgment of the court. Let's not go back there.

Adgia then made claims about the February hearing that she was "shushed" by her attorney and, "Well, by your face [Judge Meche], too." The trial court reiterated that everyone agreed under oath to the provisions discussed at the February hearing. Adgia stated, "I don't know where we go now but clearly there was no meeting of the minds." The trial court again explained it was a binding agreement. Adgia responded, "But my understanding was not placed on the transcript and when I tried to say something to make something more specific it was shushed. And my lawyer can tell you that and that is relevant because that is everything." Adgia then complained that the trial court was not "enforcing the agreement," more particularly, "My understanding of the agreement . . . which is everything."

The trial court then explained to Adgia that she could not cancel Jon's summer visitation if he failed to meet a requirement of this agreement, in this case, enrollment

10

in the unaccompanied minor program.[5]  The trial court again reiterated that the February hearing resulted in a binding consent agreement.  Adgia again stated "there has to be a meeting of the minds" and that she was "shushed."  She further said (emphasis added):

> Let's just wake it back up. And you know what, we can still do this contempt on today because I do want him to see the child on the summer and if that what it takes to get though this and to also, yeah, *cure what's being said that's not correct, let's do that too.  We can do it all. We can do it all.*

Adgia then questioned the New Orleans police officer who was present at the airport on the day of the failed custody exchange, who testified that the child did not want to go but that Adgia was trying to facilitate the exchange.  Adgia then questioned Jon at length.

*July 10, 2020- second day of the hearing*

The trial court started the hearing working with the parties to facilitate visitation with Jon and stated it hoped Jon's motion for contempt could be dropped. It further stated:

> I will see to it that we have a written judgment that is very clear about what is expected of whom and when.  . . . We are going to hash out whatever details about the judgment in February, and I'm going to probably prepare the judgment myself—which I don't really have the time or the desire to do, but I think duty calls-and going forward we can work this out.

The trial court then discussed involving a parenting coordinator, Walter Camos, about whom Adgia said, "I trust that guy.  We met with him a few times. He seems to have really connected with Margeurite and I think he can really help." She then agreed to the appointment of Camos as counselor.  The trial court then stated:

---

[5] Jon explained that Southwest did not participate in the unaccompanied minor program past a certain age and that is why he ended up flying to New Orleans to personally accompany the child.

. . .part of the reason we're here, part of the reason we were on the phone June 1st, was the lack of a specific judgment. And I do feel that we need a judgment, and then that judgment will hopefully---we would do a judgment that will be geared towards getting her the rest of the way, which is eighteen. And then of course, you or Mr. Hartman could always file a rule to modify it if doesn't work. Not to say you'd win, you understand, but that procedure is available to you if circumstances change and it's not working.

. . . But I do feel, . . . that we probably need to get the whole issue of the judgment put to bed---clarified. And that's why I said that going forward, I would be inclined to put in the order that in the future, tickets either be unaccompanied minor ticket or that she be accompanied by an adult relative for safety.

After further discussion Adgia stated:

Since we're changing that, and I had given up money that I really need [for] her, can we revisit the financial side and just have pay on the --- on whatever the guidelines would be and the proportion of her schooling and extracurriculars and medical, which that ---"cuz" this was very --- this was directly tied to that. This was a full-on negotiation thing.

The trial court responded:

Here's the problem. What you're asking is to go back and basically unravel the whole thing. Yes, I'm willing to go beyond the ordinary rules of procedure to do what I think is in the best interests of the child, but at some point, these things---what's you're essentially asking would require a whole new trial.

Adgia responded: "...and I appreciate that and I feel the same and I don't want to drag something out." The trial court stated:

---procedurally---procedurally on the first page I explained it. Page one, page two and three I explained it. This will become the judgment. Do you agree? Do you agree? Counsel agrees. And you had a lot of little conferring with Ms. Deluca. . . . you and Ms. DeLuca had negotiated all day. I thought we had an agreement and in the end though—at the end of the day I said, are you sure? And everybody said yes.

ADGIA: Yes, because I knew what was intended by the forty-five days, and if he didn't do everything within the forty-five days I could move forward without these problems.

Further on, the trial court stated:

I'd rather make it clear that the February 7th stipulation was an order of the court, put it in writing. The parenting coordinator's already put in place. If we need to modify it just to make some time as part of the agreement to make the contempt go away, I'm willing to do that. And then the real important thing is get back to Camos.

ADGIA: I agree.

The trial court then discussed the makeup periods for the extensive time Jon lost over the summer following the failure of the June 1 and 2, 2020 custody exchange. These plans were discussed in great detail based on flight times, airports, and various other stipulations required by Adgia. The makeup periods were clearly discussed as deviating from the regular plan. The trial court stated:

THE COURT: Well, there's that, but I want a judgment this time. I'm not making the same mistake twice.

. . .

THE COURT: We're getting a written judgment. And that's why you have---that's why you don't just rely on a transcript because it doesn't specify these things, right?

Adgia responded with a requirement that the child be returned on a Friday during the school year when returning from a holiday. The parties continued extensively discussing specific provisions regarding holidays and time. Adgia then asked for clarification regarding days of child support payments, claiming there was a lag from the days it was payable on the 5th and 20th. The parties then discussed paying for the parenting coordinator. The trial court reviewed testimony from the February 7, 2020 hearing in which both parties agreed to equally divide the cost. Jon then agreed to dismiss the motion for contempt. Then there was disagreement as to whether the contempt motion would be dismissed with prejudice. Adgia stated: "Please can it be with prejudice. I can take it off ---no, I want it off my back. Well, this is a negotiation, it's a finish, a final thing." The trial court then said, "This is a ruling. The motion for contempt is dismissed with prejudice reserving to both parties the

right to re-urge any factual allegations that they feel would be relevant in any future contempt proceedings." Then there was disagreement about preparing the judgment.

The following colloquy occurred:

ADGIA HARTMAN:
She [Jon's counsel] will never supply a judgment that doesn't have a lot of other stuff.

THE COURT:
Okay, but, oh understand if I do the judgment, I'm doing my standard judgment which may have some other stuff in it, but then that's c'est tu finis. So, think about it. You'd rather she prepare it and give you a copy and you have a chance to comment or you rather me do it and then be a done deal?

ADGIA HARTMAN:
I'm the---

THE COURT:
Because my judgment will be this—let me just tell you---I'm taking the transcript, I'm putting that in writing, I'm putting today's stipulation---which probably today's stipulation needs to be separate judgment anyway, which one of us can do---but going back to February 7, 2020, beyond---I didn't go back and check the old judgments, okay. And you did have part of the stipulation that anything not directly addressed in the stipulation of February 7th carried forward. But all I'm worried about is this, some standard provisions that say, don't disparage the other parent, don't talk about litigation, don't put the child in the middle---that type of stuff.

ADGIA HARTMAN:
All of that I will be for you doing.

THE COURT:
That's all I'm trying to do.

ADGIA HARTMAN: Okay, then please you make it. I'm all for all of that.

THE COURT: I'll do the judgment. What about the judgment for the contempt today? Want me to do that as well?

…

The COURT: I'll do it.

The trial court stated that it would try to clarify a provision about forfeiture if the 45-day timeline was not met. And Adgia said, "I love that you're 'gonna' put no

14

talking bad about the other parent and no making nothing bad---." The trial court noted it would designate a mandatory Facetime, Zoom, or video conference to which Adgia responded, "And he's welcome to do that. It's open. It's free and it's open." Adgia then agreed to a video conference on Sundays at 5:00 p.m., stating "Perfect. Well, I guess." Adgia then stated:

> I'm opposed to all of this additional language that she wants to put in about I would [have] domiciliary parent obligations and duties, and all of this stuff. That was part of the agreement. If that kind of language is going to go in there the whole thing is going to the trash, because---"

Jon's counsel responded it was standard JCIP language and the law. Adgia replied the JCIP would open the door for "constant Wizard messages, constant abuse." The trial court reviewed various standard items of notification such as of extracurricular activities by the domiciliary parent, not the child, to which Adgia responded to the trial court: "No, she can tell him her activities. Stop putting me in the middle. I don't want to be in the middle. She talks to her dad and she can tell him everything." The trial court responded, "[T]hat's the law," and reminded Adgia of her duties as the domiciliary parent. The trial court insisted on Camos, and Adgia responded: "And I love that guy. He's amazing." The parties were then sworn and asked if they understood the agreement, that it would be judgment of the court effectively immediately, to which Adgia responded, "I do." She was asked:

> Q. And you have been representing yourself here today---well, the last two days?
>
> A. Yes.
>
> Q. And you have participated in the settlement discussions, negotiations, correct?
>
> A. Yes.
>
> Q. And you heard the stipulation or the agreement that was placed on the record today, right?

A. Yes.

Q. You were in court when that was done?

A. That's right.

Q. Right?

A. Right?

Q. And do you understand the stipulation?

A. Yes.

Q. Is there any questions about any part of the stipulation?

A. No, sir.

Q. Okay. If there is let me know. I'm not trying to---

A. If the child is---still has her right to private schooling, right? And I can still, if we need to, come back and---

Q. My understanding is, I'm taking---as I've said several times---I'm taking the stipulation that was reached in February and I'm reducing it to a written judgment that will match the stipulation that was reached.

A. Okay. So, it still says whatever's not [addressed] on this one---

Q. Correct.

A. You're still going back and honoring the previous?
Q. Right.

A. Okay. I'm satisfied with that.

Q. That was part of the deal in February but I'm getting that on paper because part of reason we're here today is because it wasn't. So, I'm trying to address that problem. But that stipulation on February 7, 2020 will be reduced to a judgment. Part of that stipulation was that all prior judgments not directly affected by the stipulation on February 7th would remain in full force and effect.

A. Okay.

Q. Right?

A, Yes, sir.

. . .

16

Q. [W]e're keeping the judgments that were previously in place with the modifications made in February and with the arrangement made in response to the motion for contempt that was before the court today.

. . .

Q. The prior judgments remain in effect except as modified by February 7, 2020, and except as modified by the agreement in connection with today's motion for contempt.

A, Okay, Yes, sir.

Q.. I have to ask you, so this in fact---you understand the agreement?

A. Yes, sir.

Q. And this is in fact what you have agreed to, to resolve the issues that would have come before me or that I would have had to decide in connection with Mr. Hartman's motion for contempt?

A. Yes, sir.

Q. And you understand everything else I've said about taking the February 7th stipulation, putting it into a judgment and then putting today's agreement into a judgment as well?

A. Yes, sir.

Q. And that is in fact what you have agreed to do to resolve the issues that I would have had to decide today?

A. Yes, sir.
Q. Great.

The trial court then stated that it would prepare the two judgments. These two judgments were subsequently rendered by the trial court on October 5, 2020. The first was a "CONSENT JUDGMENT," which ordered that the child visit Jon beginning July 11, 2020, and be returned to Adgia on August 3, 2020. It then set forth various make-up days in the upcoming year due to the missed period from June 1 thru July 11, 2020. It dismissed Jon's rule for contempt with prejudice. It set forth the Sunday video conferences discussed above, ordered that previous judgments were in full force and effect if not in conflict, and ordered each party to bear their own costs.

The second judgment rendered on October 5, 2020 is the "CONSENT JUDGMENT AND JOINT CUSTODY JOINT IMPLEMENATION PLAN" that stated in part:

> On or about May 18, 2020, counsel for Geralyn Adgia Ballanco Hartman filed a *Motion to Make Transcript Judgment of the Court with Incorporated Memo in Support.* By *Per Curiam* dated June 18, 2020, the court deferred ruling on the motion. At the conclusion of the hearing held on July 9-10, 2020, the court ruled that it would deny the *Motion to Make Transcript Judgment of the Court* and prepare and issue a Judgment in accordance with the stipulation reached on February 7, 2020. Accordingly,
>
> **THE COURT**, considering the mutual agreement and joint stipulation of the parties reached on February 7, 2020, enters the following Consent Judgment:

The judgment consisted of nine pages setting forth detailed requirements of the custody plan.

### *July 12, 2021 hearing on the motion for new trial*

Adgia subsequently filed a motion for new trial on October 13, 2020. At the hearing on the motion for new trial on July 12, 2021, the following argument and discussion occurred.

Adgia's "co-counsel" argued that the October 5, 2020 "judgment" was not in "conformance with the stipulation of the parties made in open court on February 7." Adgia disagreed with the Joint Custody Implementation Plan. Co-counsel left it to Adgia to address the particulars of the differences between the two. While conceding that the "stipulation" rendered February 7, 2020 was "not the best" and that the trial court in the October 5, 2020 Judgment used a standard implementation form used in the Twenty Seventh Judicial District, co-counsel argued that because this was a non-considered decree the parties could stipulate to whatever they wanted to and the trial court could not "go behind what they stipulated to and render a standard form."

18

Jon's counsel argued that the local rules requiring a JCIP do not make any reference to considered versus non-considered decree. As noted above at the hearing on July 10, 2020, Adgia consented to the trial court creating the standard form after it informed her it would include standard language, such as to not disparage the other parent and that she agreed, responding, "All that I would be for you doing." Jon's counsel pointed to numerous times in the record when Adgia further commented that she was in favor of the JCIP. Adgia objected, stating that "if [Jon's counsel] wants to make disparaging comments or statements that she now proves it, because the exact opposite is true." Jon's counsel again argued the JCIP was in a standard form required in the local rules and that Adgia asked the trial court to prepare the judgment. Adgia responded that she believed the trial court was only referring to the three-page consent judgment that was a stipulation between the parties to drop the contempt hearing motion against her at the July 9-10, 2020 hearing. Adgia then claimed that her motion to make the transcript the judgment was deferred to another day.

Jon's attorney then moved for sanctions for making false allegations that she prepared the judgment that the trial court signed. Adgia insisted that she misunderstood the nature of the July 9-10, 2020 hearings and believed there would be another hearing on her "Motion to Make the Transcript the Judgment" because she "still thought it was a thing." Adgia again argued that she had no idea that anything other than Jon's contempt motion was being addressed and she just did not understand why the trial court "stuck additional stuff in there." She admitted she did not object at the hearing:

> [B]ecause they are nice things. I didn't withdraw my – my intention to have a Motion on the – on the – my intent to have a hearing on the Motion to Make the Transcript the Judgment, because I thought that was a thing.

19

The trial court and Adgia's co-counsel both agreed that the motion to make a transcript a judgment was void. Jon's attorney again argued that Adgia's argument that she misunderstood was baseless in light of the testimony given at that hearing and the fact that she is a practicing attorney. Adgia responded and alleged that at the July 9-10, 2020 hearing, the law clerk pointed out that if the motion for contempt was granted she could lose custody of her child and that sentiment "strikes the fear." Adgia went on to state:

> If I may finish, cause if I have to go the Court of Appeals, because this Judgment is so injuring to my child that I can't let it stand. I will have to fight – I will have to fight all the way to the Supreme Court, because of the additional things that are put in here. I cannot let them stand. I have to protect this child and I can point out the things and -- and I also want make sure I want you to know this – this Judgment is – if – until I was sitting in this Courtroom today, is the first time that intellectually I was aware that – what Judge said and I agree that's what it says on the transcript. But sitting in here with you today, and listening to that, is the first time I'm really even aware those words were even said about both Judgments, and what have you. The emotion of a mother when you're by yourself, and you are threatened to lose your child, and then they start talking about other things. In my mind all I could remember, was thinking why is he talking about this? This is not today, this not today and then I kept thinking okay, but it's nice things so don't fight about the nice things, but I did not intend for my lawyer's Motion to Make the Transcript the Judgment to go away. It was deferred. I was not served with it. It should not even have been addressed in Court that day. It shouldn't have and that was – that was right after, also at some point the Judge was fussing on me about bringing the child to Court, and I didn't want to bring her to Court, but – but the Law Clerk called me and told me I had to bring her to Court and then the Judge didn't even know that, that had been done. That freaks me out, and that's what kept happening. I'm only a mom.

Adgia was questioned why she did not have an attorney present even though there was a month between her previous counsel withdrawing and the hearing. Adgia then attempted to explain an item in the judgment she disagreed with, and Jon's counsel pointed out in the record where she specifically agreed to it. Adgia again claimed she was confused at the hearing. The trial court questioned how she could have agreed if she was confused, and she stated: "I did agree, but I still – I

20

didn't understand why we were doing it and I didn't understand why we were doing it, but – I still want to object." She again claimed she was worried about losing custody of her child and that when the trial court started to "blur the lines" between the contempt motion and the motion to make the transcript a judgment, she "was not going to argue with him especially since the few things that he did say were very nice things."

The trial court then offered Adgia the opportunity to reset the "Motion to Make the Transcript a Judgment." She responded:

> I think procedurally I need to stick – based on what I understand about my options I have to stick with the Motion for New Trial now and these Judgments either need to be – either the Motion for New Trial either has to be granted or not granted. We're stuck with right now. That's my understanding.

The trial court offered to go through the JCIP line by line to modify it as necessary. Adgia declined even though she stated she was "good with these things, but I can't give it up because I don't know what's gonna happen and this can't stand because it is harmful to my child."

The trial court noted that La.R.S. 9:335 does not differentiate between a considered or non-considered decree. Louisiana Revised Statutes 9:335 states the court shall render a joint custody implementation order except for good cause shown. Louisiana Revised Statutes 9:335 states (emphasis added):

> A. (1) In a proceeding in which joint custody is decreed, *the court shall render a joint custody implementation order except for good cause shown.*
>
> (2)(a) The implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents.
>
> (b) To the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally.
>
> (c) The implementation order shall include a provision that when either party is required to evacuate this state with a minor child because of an

21

emergency or disaster declared under the provisions of R.S. 29:721 et seq., or declared by federal authority and it becomes impossible for the parties to exercise custody as provided in the judgment, the parties shall engage in continuous communication regarding the safe evacuation of the child, the location of the child during and after the emergency or disaster, and an interim custody plan for the child until the custody provisions of the judgment can be resumed.

(3) The implementation order shall allocate the legal authority and responsibility of the parents.

B. (1) In a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown.

(2) The domiciliary parent is the parent with whom the child shall primarily reside, but the other parent shall have physical custody during time periods that assure that the child has frequent and continuing contact with both parents.

(3) The domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise. All major decisions made by the domiciliary parent concerning the child shall be subject to review by the court upon motion of the other parent. It shall be presumed that all major decisions made by the domiciliary parent are in the best interest of the child.

C. If a domiciliary parent is not designated in the joint custody decree and an implementation order does not provide otherwise, joint custody confers upon the parents the same rights and responsibilities as are conferred on them by the provisions of Title VII of Book I of the Civil Code.

The trial court attempted to elicit the specific disagreements Adgia had with the JCIP, but she made a number of general accusations unsupported by the record. She often referred the trial court to her motion rather than arguing in court, stating things like:

> The whole way thing came about and why it's not nice. One of the most offensive things, is – you know it's all in my Motion, Judge. I don't want to do the wrong thing and put more on the record, cause it's very –I worked hard going item by item and put the reasons for my objection in my Motion. I don't want to mis – state it.

Adgia then made a number of arguments in disagreement with the JCIP, stating that it gives Jon the "opportunity to harass, abuse, manipulate, cause havoc."

22

The trial court again offered to reset the hearing and let Adgia argue "each one of the differences that you're complaining about and I'll make a decision at that point, whether it's not substantive or it is substantive." Her co-counsel agreed, and Jon's counsel reserved the right to ask for sanctions against Adgia based on her motion.

***July 15, 2021 hearing on the motion for new trial***

On July 15, 2021, the parties returned to court. Adgia began by again stating that she was confused at the July 9-10, 2020 hearing and does not practice family law. After lengthy discussions of unrelated accusations and claims, which the trial court entertained at length, Adgia began addressing her disagreements with the JCIP. She disagreed with the standard language. When questioned what she disagreed with, Adgia attempted to disparage John. Then she addressed each and every one of her complaints, none of which had any substantive value but only served as a means to make assorted accusations about Jon and how he would abuse the provisions. Various other provisions were reviewed and agreed to. At one point, Adgia was instructed by her co-counsel to stop screaming in the court room. Adgia again claimed that she did not understand what she was agreeing to at the July 9-10, 2020 hearing. The trial court stated:

> What you did and what you meant to, you did it on the record under oath completely Boykinized by Judge Meche. Never seen that before in a domestic matter that intense, but he foresaw what was gonna happen, so you agreed to all the little tweaks and whatever of the February and the July hearing and that was all in these two Judgments and which is why we are trying to resolve what [you] say is substantive differences.

Adgia then made a number of unsubstantiated claims about the parenting coordinator–that she formerly agreed to–as being "a mechanism that an abuser uses." The trial court again instructed Adgia to file a motion to compel anytime Jon is not doing what he is supposed to. Adgia continued to make claims about what might happen, like receiving too many emails or texts from Jon to which the trial court

23

instructed her where the courtroom door was located and to file a motion for contempt. The trial court stated:

> We can't eliminate every possible issue. Ya'll addressed them. Judge Meche expanded on them because he foresaw what was gonna happen, so that why there's some additional wording that may not be in the stipulation, in fact he said, "I'm gonna use my standard JCIP." That's in the transcript.

Adgia claimed that she did not understand what "geographical language and telephone number" meant, fearing Jon would tell her, "I'm in the mountains in Canada." The trial court stated, "Black and white letter of the law, geographical location is coordinates." Furthermore, addresses were provided.

Adgia had a "huge problem" with subsection 4(m) of the JCIP relating to authorization for law enforcement that essentially allows either party to call the police when there is a problem at a custody exchange.[6] She stated, "I firmly object to that, and is there to an operation of law, Your Honor that if I am very naughty and I withhold the child from him on purpose, that he comes to Court and ya'll see what the problem is." The trial court responded:

> Absolutely, it happened already. It happened already, but the problem is, it's not like he can get his visitation the following week. He's flown down here, I mean, it happened already. He's flown down here, made all the plans, paid all the money and then whatever – however, it fell apart, that's when the cop got involved in New Orleans, I think, if I'm correct.

Adgia then stated that "if there's a reason that I withhold the child, I – swear on my – on my heart –" to which Jon's counsel began "Your Honor," and Adgia continued on, "Stop. Do not interrupt me like that, I'm talking about my baby and

---

[6] The provision stated:

> Any law enforcement officer, including, but not limit to, law enforcement officers employed by municipal police departments and/or deputies employed by sheriff departments, or both, are hereby authorized, empowered and directed to enforce the physical transfer of a child from one party to another in compliance with the terms and conditions of custodial provisions contained herein.

her safety and this is the issue." She was reprimanded by her co-counsel for speaking to Jon's counsel in such a manner. Jon's counsel objected to the "continuous attacks on Mr. Hartman, Mr. Hartman's character, my character for lack of a better word, the parenting coordinator, and everybody else she's accused has been completely inappropriate." The trial court sustained Jon's counsel's objection. Adgia continued:

> Well, I'm not gonna agree with – if somebody touched my child, they're gonna think they caught wild crazy fire breathing dragon. My child is 14 years old, and nobody is going to put their hands on her. Nobody's gonna put their hand on her. I will come to Court under the regular proceedings and procedures, but I can't agree with this. That's a deal breaker. That's no, I can not agree to that, and I will die on that hill.

Adgia did not agree with the recitation of statutes in the JCIP such as the relocation statute because, "If I can't be guaranteed that it's simply the statutory language, . . . then I'm just gonna object, because I'll object to the statute being put in there." The trial court noted it had to follow the statute. She objected to things like informing Jon of educational issues, and that the provision requiring him to tell her about medical and dental issues was "weird."

Eventually, the trial court concluded that the only unresolved issues in the JCIP were the section pertaining to law officers and a section relating to who is responsible for the cost of transport if the court does not approve the modification and a parent wants to move. Adgia again stated that the section authorizing law enforcement was a "deal breaker" because Jon is a "law officer" within the meaning of that provision because he works for Homeland Security and, "You will never break that thin blue line about who knows him and who doesn't." Adgia reiterated that if she were "naughty" and refused to allow the child to go, then Jon could take her to court. She refused to agree to the addition of "not a party" so that Jon could not enforce the provision himself and she refused because:

I cannot let someone put their hand on my child. I can't. I just can't agree to it, and I have to object, and if I see anyone putting their hands on my child they're gonna put me – I know I'm gonna go to jail, so that's okay, because you can't touch a child, she 14 years old and – and – and I just can't agree.

She was asked numerous times by the trial court for an alternative of not having the child in control of the situation. She had none. The trial court refused to remove the provision but did add to it "not a party or have any affiliation with a party," after "Any law enforcement officer."

Pertaining to the other complained of provision, Adgia objected, "this is not nice" because it only affects her. The trial court responded that the provision really did not matter since Jon does not live in the State of Louisiana. Jon's counsel then agreed to remove it since it was not applicable because Jon lives out of state.

At the very end of the hearing, Adgia argued that visitation could be by plane only and if Jon visits his family in Marrero, he cannot pick up the child in Lafayette; the child must fly to New Orleans. The trial court deemed this unreasonable and refused to enforce it. Adgia again referred to this as a "deal breaker" and stated she would pay for the plane ticket. The trial court refused and said the provision covering the forty-five days notice was sufficient whether the visitation was in Louisiana or California. Adgia's co-counsel said that was insufficient because it did not spell out the exact place the exchange would occur. The trial court said the exchange would be in front of the Sherriff's Department. It further stated that it read the transcripts that Judge Meche implemented three times and that there was nothing substantive added to the JCIP.

The trial court then summarized the changes it made to the JCIP, which amounted to removing a few phrases and adding a few words. At the conclusion, the trial court denied the motion for new trial over Adgia's continuing vague objections, stating:

The Court has heard testimony for two (2) days on a Motion for New Trial. Part of the argument, was Ms. Hartman stating that she wasn't represented, she wasn't ready to have a hearing, and she was representing herself. The Court also notices that the Judgment filed in 2011 was filed in proper person, meaning she represented herself in that file. Now she is here representing herself, stating that she is representing herself, and in the transcript Judge Meche asks you "and you have been representing yourself here today, well the last two days" Answer: Yes. So, Ms. Hartman is again representing herself today, that's considered having counsel. The Judge has read the transcripts of the July 10, 2020 and the February 7, 2020, and the Court take on that is a blend. The July ruling was basically a clarification of the February ruling with some differences, additions, but it was agreed to and accepted by both parties after a long Boykinization on each party by Judge Meche. Umm – Counsel has also said that – Ms. Hartman has stated that the Consent Judgment stated – dated October 5, signed by Judge Meche, there was no issues with that. Um, the Court is authorized under 9:335 to file a Joint Stipulated Joint Custody Implementation Plan, which it has in fact done so. The record reflects that Judge Meche has stated that he was gonna file, or prepare himself, both judgments which he ultimately did. The Consent Judgment, and Consent Judgment and Joint Custody Implementation Plan, and the contents of the transcript – the substantive contents of the transcripts were in fact transposed into both of these documents. The Court doesn't find any substantive changes. The Court may have added a few issues which would allow clarification and avoidance of possible problems. With that said, the Court is gonna deny the Motion for New Trial in this matter.

Adgia then filed the present appeal.

## SANCTIONS FOR FRIVOLOUS APPEAL

An appellate court can award sanctions for frivolous appeal pursuant to La.Code Civ.P. art. 2164, which provides:

The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. The court may award damages, including attorney fees, for frivolous appeal or application for writs, and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable.

Although sanctions for frivolous appeal are penal in nature and must be strictly construed, we find this case is ripe for sanctions for frivolous appeal. *See State Farm Mut. Auto. Ins. Co. v. Calahan*, 571 So.2d 852 (La.App. 3 Cir. 1990), *writ denied*, 576 So.2d 51 (La.1991). Sanctions for frivolous appeal are warranted

27

"when there is no serious legal question, when the appeal is taken solely for the purpose of delay, or when it is evident that appellant's counsel does not seriously believe in the position he advocates." *Id*. at 854; *Blanchet v. Boudreaux*, 15-60 (La.App. 3 Cir. 8/19/15), 175 So.3d 460, *writ denied*, 15-2156 (La. 1/25/16), 185 So.3d 749. We have reviewed the record and find sanctions for frivolous appeal are wholly supported by it.

The sum of Adgia's failed argument on appeal is that the transcript from the February 7, 2020 hearing was "res judicata." In considering the following facts, we find that sanctions for frivolous appeal are unquestionably warranted in this case.

First, Adgia has been a member of the bar for over twenty-five years. Although pro se litigants are given some leeway in the appellate process because "a small number of such litigants expend a disproportionate amount of the court's time and resources," we find there is simply no excuse for the "brief" submitted to this court by a long-standing member of the bar. *Calahan*, 571 So.2d at 855. In the cited case, Calahan was a law student at the time of trial in which he was a pro se litigant, and a lawyer when he was sanctioned for frivolous appeal.

In the case at bar, there was never any doubt that the February 7, 2020 hearing would be reduced to a written judgment. Adgia's co-counsel at the hearing on the motion for new trial agreed that the motion to make the transcript a judgment was dismissed.

To now attempt to resurrect her claim that the transcript was a judgment and is res judicata is contrary to her testimony agreeing to the provisions and requesting her own modifications, the facts and circumstances surrounding the hearings including her co-counsel agreeing to dismiss her motion to make the transcript a judgment, and the numerous opportunities she was given to set forth any complaints she had with the proposed JCIP. Adgia even refused the offer to set another hearing

28

on her motion to make the transcript a judgment, arguing that procedurally she had to go forth with her motion for new trial. Moreover, the trial court, at the July 9-10, 2020 hearing and, again, at the July 12, 2021 hearing, anticipating what is occurring now, could not have been more explicit and repetitive in confirming that Adgia understood and agreed to the terms of the judgment by questioning her at length.

Second, on numerous occasions, Adgia agreed to all of the provisions of the JCIP except for the two provisions discussed above. Due to her utter failure to properly appeal the judgment, those two alleged "deal breakers" were not preserved for appeal. Moreover, even if they had been, the trial court would not have erred in refusing to accommodate Adgia's request that her child be forced to fly from Lafayette to New Orleans and that a law enforcement officer unrelated to any of the parties could not assist in ensuring that the child board the plane for Jon's visitation periods.

Third, for Adgia to claim that she "misunderstood" and was confused at the July 9-10, 2020 hearing about the nature of the proceedings and that her motion to make a transcript a judgment was deferred have no basis in truth based on her own testimony at the hearing and border on an ethical violation of the Rules of Professional Conduct, Rule 8.4 (c) and (d).[7] Adgia actively participated in the negotiations and questioned witnesses. Far from confused or frightened, from the record, Adgia appeared defiant and sorely lacking in respect due the trial court (two different judges no less), each of which exhibited enormous patience throughout the

---

[7] Rule 8.4 addresses misconduct and notes that it is:

. . .professional misconduct for a lawyer to:
. . . .

(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) Engage in conduct that is prejudicial to the administration of justice.

hearings and through Adgia's numerous baseless accusations of conspiracy and wrongdoing. Adgia refused to present argument at the hearing on the motion for new trial and referred the trial court to read her written motion. Yet, the trial court set another hearing to allow Adgia to go over the JCIP line by line. The trial court's painstaking review of this document and Adgia's objections to it leave no room for doubt that she was not confused at all.

Finally, for an active member of the bar to submit a "brief" to this court of such a deficient nature solidifies our finding that this appeal was nothing more than an ongoing baseless continuation of litigation meant to delay and harass her opponent with her child's best interest of least concern. Moreover, as pointed out by Jon in his motion for sanctions, "Adgia requested several extensions of time to extend her briefing deadline . . .for an incomplete record in which she alleged there were missing records vital to the administration of her appeal," then filed her brief containing "less than one page of argument, with no pertinent supporting statutory authority or case law whatsoever." This resulted in the trial court staying the proceedings, including Jon's motion to modify custody. We find there was no reason for filing this appeal other than to cause undue delay in the proceedings. Accordingly, we assess $5,000 in sanctions against Adgia for frivolous appeal and assess her with $2,500 for Jon's attorney fees on appeal. We caution her to avoid submitting an appeal of such an inferior and deficient nature to this court again.

## CONCLUSION

Defendant-Appellant, Geralyn Adgia Ballanco Hartman's, appeal is dismissed for failing to adhere to the requirements of the Uniform Rules—Courts of Appeal, Rule 2-12.4 (B)(3)-(4). However, we have reviewed the entire record in this matter and find sanctions are wholly warranted. Moreover, had Adgia properly

30

appealed the denial of her motion for new trial, we would find no error by the trial court relating to the two provisions she objected to.

Adgia's arguments are baseless and unfounded. She claims to not understand what common statutes mean even though she has been a lawyer for more than twenty-five years. She verbally harassed nearly everyone in the courtroom and was reprimanded numerous times by her own co-counsel for her inappropriate outbursts. She repeatedly advanced baseless statements and arguments.

We assess Adgia with sanctions of $5,000 for frivolous appeal and $2,500 in attorney fees for work performed on appeal by Jon's counsel. All costs of this appeal are assessed to the Defendant-Appellant, Geralyn Adgia Ballanco Hartman.

**APPEAL DISMISSED;**
**SANCTIONS IMPOSED.**